Good morning, and may it please the Court, my name is Cliff Gardner. I represent Petitioner Joshua Richter. We've been advised that with me at counsel table is counsel for Mr. Petitioner Branscombe. We'll be splitting the 20 minutes today, 10 minutes each, and I'll be reserving two minutes of my time for rebuttal, and in light of the Court's comments, I'll certainly be keeping a track of both times, both time periods, especially since I know what will happen to me if I don't. Well, we're trying to be fair, but we want to get you through, too. Thank you. Thank you, Your Honor. I'd like to focus, in the few minutes I have today, I'd like to focus on the ineffective assistance of counsel claims, because I think in some ways it's the most complex, factually, of the claims, and the claim that can probably benefit the most from my comments at oral argument. And I'm sure the Court is familiar from looking at the briefing that there are many points on which my colleague from the Attorney General, Mr. Colombo, and I disagree. So I thought I would start with three points we agree on to put the case in context. And the first point is something that the district court found, and I agree with actually entirely. The district court found that the jury heard two very different versions of this case, one from Gunner Johnson, the State's main witness, and one from Petitioner, the defense main witness. The question was, the State's theory, according to Gunner Johnson and the State prosecutor, of course, was that Patrick Kline was shot on the couch, that there was no gun battle in the house that night, and that the blood pool between the living room and the bedroom was from Gunner Johnson. The defense theory was different on all three of those pieces of evidence. The defense theory, of course, was that Kline wasn't shot on the couch. He was shot in the doorway between the living room and the bedroom. There was a gun battle, and that blood pool was not from Gunner Johnson. It was from Patrick Kline. Was any DNA testing ever done on any of the blood samples in this case? No, Your Honor, there was none. The second point on which we agree, and again, the district court found that, in fact, defense counsel could have presented evidence on every one of these points. And one of the interesting things about being last on calendar, it's not something I prefer, but being last on calendars is you get to hear excellent arguments before you. And in the first two cases, there were a number of arguments and a number of questions from the court about what hadn't been presented. The first case, the court had questions. You're asking us to speculate about what you could have presented had there been no pre-indictment delay. In the second case, you asked about the DNA evidence. You said you're asking us to speculate. You've never done any DNA testing. This is a case where we did all the testing. We have a blood spatter expert that came forward to look at all the photographs of the blood. We have ballistics experts. We have a pathology expert. We have a ballistics expert about the bullet hole itself. So we did all that. There is no speculation here. Defense counsel could have supported the theory he elected to present. And in a case where there's two different theories presented to the jury based on two different witnesses, the district court called it a credibility case. And I agree with that. But another way to look at it is that it's a corroboration case, because ultimately the jury is going to decide this case based on which of those two stories the physical evidence corroborates. And the third point on which we agree, and again the district court found, is that defense counsel presented none of this evidence. Although promising it in his opening statement and arguing it in his closing argument between those two, there was no supporting evidence presented. And that's the context that brings us to the point of disagreement. And there's a couple of them, but I'll start with the main one. Excuse me. And that is the State's position, of course, is that, yes, defense counsel didn't do any of this. The State's main position is that, you know what, it wouldn't have made a difference. It's not prejudicial. Of course, they're referring to the prejudice prong of Strickland. And I want to emphasize two points on this. This is a factually complex argument. And the first point is this. And unless the Court agrees with me on this, I don't think I can win the case. And so it's why I want to start with it in the point of disagreement. If the source of that blood pool between the living room and the bedroom is Patrick Kline, the State's cannot win its case. They could not have won that case at trial. Gunner's testimony was entirely premised on the fact that Patrick Kline was shot on the couch. If that blood pool is not Gunner Johnson's but is Patrick Kline's, the State's case falls. And let's look at the evidence on that, because one of the most interesting aspects of this case is that, at least at this point, that evidence isn't even disputed. The State didn't present any evidence to counter the experts we presented to the district court, the blood spatter expert. And this wasn't ‑‑ I mean no disrespect to our expert, Ken Moses, but it wasn't rocket science. The idea is that if a blood drop falls from six feet high, which is the State's theory, it will create a spatter when it falls. And when you look at that blood pool, there are no spatters. It's called crowning. And so the expert, the blood spatter expert, said this did not happen as the State said it happened by Gunner Johnson standing in that doorway or running through it on his ways to throw evidence out and dripping. It couldn't have happened that way. You represent Mr. Richter? I do, indeed. The thing that worries me the most about this and in both particular situations is that I have a habeas review, first of all. This is not a direct review. This is a habeas review. So I've got to find that it's contrary to or unreasonable application of clearly established federal law or an objectively unreasonable determination of the facts. And I have to look at the last decision by the court. Now, my worry is I may not have a last decision by court, so I have to have an independent review of the record. But the bottom line about the blood spatter, when I look at what the district court did in this particular situation, this federal district court said, okay, fine, there might have been a problem with blood spatter, but nobody was going under all of that blood spatter stuff when we went to trial. It came up during trial that, in fact, the pretrial investigation, the study led to a credibility case that the state was not even prepared with any or attested any of the blood, that none of that was even come up, that counsel then objected to all of that coming in. Every time they tried to present any of this stuff, which was new, he objected. He did what he had to do. And then, frankly, this was a case about, and now I'm going to characterize Gunner, about this guy who is a drug dealer, terrible person, wasn't going to be believed by a soul, none of these other people had his record, didn't have any of that kind of stuff, and that going into trial he'd done all he had to do to prepare. And now we have the situation where now I have to look at what the court would have done. And even if I talk about blood spatter or if I talk about ballistics or I talk about the location of the safe, if I talk about any of those situations, this counsel had the absolutely best witness he could go after, and he went after him, and he showed what a bad person he was. And so he did what he needed to do to get his clients off, and the jury believed this Gunner, this bad guy, over the other two, one didn't testify, over the other one, and said, we just don't believe you. So you can say all you want to about blood spatter, you can say all you want to about ballistics, you can say all you want to about location of safe, and you get to the bottom line, it wouldn't have been prejudice and there's nothing to say. A couple of responses, Your Honor. First of all, that was his argument, isn't that? That's the district court's argument, yes. A couple of responses. As to the EBPA standard, Your Honor, is correct, because this was a postcard denial by the State Supreme Court. There's independent review. The normal deference applied in EBPA doesn't apply. So let's, with that in mind, let's look at what the State court, what the district court said. You're quite right. On page 11 to 12 of the district court's opinion, he notes that AXIP's pre-trial investigation and study led him to the belief that the trial would be primarily a credibility issue, credibility case. And with all due respect to the district court, I know there's a lot of experience on the bench here, both from a practical perspective, a trial perspective, and a trial judge perspective. The fact that it's a credibility case isn't the solution to the problem, it is the problem. When you have a credibility case and it's going to be this witness versus this witness, that doesn't mean counsel's obligation to actually prove your own client's testimony true is somehow lessened. It means it's enhanced. And from a legal perspective, I'm extremely concerned. I realize in habeas we don't want to set the bar too high when we have exercise 20-20 hindsight. But by the same token, Your Honor, we don't want to set it too low. And there is nothing in either Strickland v. Washington, any case that has ever followed it, were the ABA guidelines that says defense counsel's obligation is limited to counterpunching. Now, you are right. The state never gave evidence that it was going to give notice that it was going to use a blood spatter expert, or indeed a pathology expert. But that doesn't end the analysis. If I can do what I'm all too often accused of doing one more time, if I can use a sports analogy, defense counsel isn't limited to being a counterpuncher. Defense counsel in this case looked the jury in the eye and said, I'm going to prove, I'm going to present expert testimony that the gun jammed. I'm going to prove that blood pool could not be from Gunner Johnson. It's from Pat Klein. I'm going to prove that this is a self-defense case, that one round came off, that MAC-12 .380 caliber. That's what he told the jury he was going to prove. And that was. And he effectively put on some evidence to try to do that. Actually, Your Honor, he put on no evidence when he could have put on a wealth of evidence. The only testimony he really presented is Petitioner's. He didn't call an expert to testify about the gun jamming. He didn't call the blood spatter expert. He said in his deposition he wasn't aware. Well, he was. That's a pretty good cross-examination of the State's witness, expert witness about all of that. Actually, in connection with the blood pool, he did no cross-examination on the blood spatter expert, because the State's expert wasn't testifying about the blood pool. He was testifying about other blood spatter. So with respect to the blood pool, and that, I realize I've already gone into my rebuttal time, that is the key issue in the case. If that blood pool isn't from Gunnar Johnson, the case is over. The State cannot win its case. Defense counsel could have proved that with expert testimony that isn't even contradicted in this proceeding. So, yes, we have an independent review standard. Yes, we have AEDPA. But I don't see how you can look at counsel's actions in this case and say they came within what the Sixth Amendment requires. Yes, it's true that the State didn't give notice it was going to call a pathologist or it was going to call a blood spatter expert. But that's not where defense counsel's obligation ends. That's not what the ABA guidelines say, and that's not what Strickland says. What was the evidence left before the jury as to – from expert testimony as to who the source of the blood pool was? Well, there was no evidence before the jury, expert or otherwise, as to who the source of the blood pool was. And that's really the problem in the case. Perhaps for understandable reasons, the State didn't consult a pathologist. We now know from Dr. Herman's undisputed testimony what a pathologist would say about whether Gunner's wounds could have caused that blood flow. They can't. And perhaps for good reasons, the State didn't consult its own blood spatter expert about the blood pool. We know what a blood spatter expert would say. It didn't. But that doesn't limit defense counsel's obligation. So there was no expert testimony with respect to the blood pool as to who had caused  Correct. There was none. Thank you. You better give counsel a chance. I better. I reserve whatever negative time I have. You don't have too much. Yours is gone. May it please the Court, Anne McClintock, Federal Defender's Office, on behalf of Mr. Branscom. And I will try to be kind to my colleague if he needs help at the end. You may not get through any better than he did. Go ahead. That's right, Your Honor. I realize that, too. One of the – the follow-up to Judge Trott's question, just on a factual thing, I think the only evidence that we have that suggests anything about the blood pool isn't the pool, but the splatter of blood on the – I believe it's the door jam near the pool. And that was the only expert testimony. Where did the serology testimony come in? It came from the prosecution side. It came from Ms. Briggs. And in post-conviction, we amply demonstrated, without any contention from the AGs to the contrary, that her testimony was flatly wrong. Her medical theory for why Mr. Klein could not have been the donor to that splatter was wrong. And in my context for Mr. Branscom, I also want to talk about the ineffective assistance counsel claim, but in a different context, in the sense that this isn't a case that Judge Smith has described where someone has amply or efficiently prepared for what he thought he was going to present, which is co-defendant or acted in self-defense, and I'm going to show what a bad character, the main witness for the prosecution is. He didn't do that. What happened in this case is that Mr. Dixon takes over a case with five days before trial. They get a continuance, four weeks, and during that time, we have clear testimony from his co-counsel, from co-defendant's counsel, Mr. Axett, that he did nothing. Dixon did nothing to prepare. So it's not a question of him strategically choosing, I'm going to prepare in this fashion, and then being surprised during trial. This is a case where we have a man now disbarred who did nothing. He was prepared. He was unaware of jury procedure, jury selection procedure. He was unaware of discovery. It appeared to me he would still be reading discovery during the trial. This is a man, I'm not saying that he was asleep or anything that extreme as we've seen in some of the cases, but this is a man who walks in, and as Mr. Axett says, he just figures he's going to razzle-dazzle in the trial. He knows how to try a case, but he has done no preparation whatsoever. And the result of that is that my client was effectively denied counsel during that pretrial phase, and as a fact, he was effectively denied counsel during trial because he had nothing to work with to substantiate any of this cross-examination. For example, in the Spriggs context, Mr. Dixon asked no cross-examination questions whatsoever. Mr. Axett, Mr. Richter's counsel, explained during the depositions, when Spriggs' testimony as an expert came up as an issue, Axett was left holding the bag trying to figure out what to do with it. Mr. Dixon did nothing. So our argument is that Dixon's performance was so poor that it was effectively a denial of counsel that fits straight into Strickland, Chronic, Powell v. Alabama and those line of cases where there is no prejudice analysis needed. We believe that we equally prevail under a traditional Strickland analysis for the reasons that are set out in the briefing both by Mr. Richter's counsel and myself. But, counsel, wasn't the isn't the Chronic claim effectively out because it wasn't even raised in the petition or the amended petition in the Federal court? That's absolutely wrong. I mean, the Respondent's contentions about what the pleading requirements in Federal court are incorrect. Felix v. Mayo tells us, and if you look at the standard form for a habeas petition, it says state your facts. The legal claims were there. The 4th, 5th, 8th, 6th, 14th Amendment were the claims that my right to effective assistance of counsel were denied for these factual reasons. And the facts are well set out both in the habeas petition in the California Supreme Court and in the petition in Federal court. Well, you don't deny, do you, that the first time really the claim was ever developed was the supplemental brief? I don't deny that the first time the word Chronic was used was in the supplemental briefing. I deny the characterization. We shorthand lots of language in the law and other professions as well. And when I talk about a chronic claim, that's probably not an accurate characterization of it. It's a 6th Amendment claim that my claim was denied effective assistance of counsel. A chronic claim is but a shorthand for an explanation that in certain limited circumstances the petitioner does not have the added obligation of showing prejudice. And I think that fits into this case. I understand the Respondent's arguments in their Apley's brief. I think they just don't make any sense given what the factual pleading requirements are in Federal court. And if you look at it, Judge Smith, you look a little disconcerted by this. Well, no. I'm just trying to have some thought about that. When I read the argument, I especially went back to read what had been done so that I could determine whether I really felt like it hadn't been raised or not. And I remember reading it, so I was just trying to put that in perspective. I think you're well-characterizing your argument, but I'm worried about whether it was raised. I think if there was any kind of notice-raising issue, it would have been raised in district court. Instead, the Respondents addressed the chronic argument in their merits. That's in our supplemental excerpts of record. They're briefing on that. I think if you look, if you take their argument and just apply it across the board, our Second Amendment petition doesn't cite any cases other than what happened in State court. It's not until the evidentiary development is taking place, somewhat in the traverse when you've got all these exhibits, that we can put some legal context to these facts. And that's where these cases come in. Chronic doesn't come up later. But I don't think that foreclosed the issue. The issue is whether his right to counsel was denied in the Sixth Amendment, and that was one of the other things. Kennedy, when did you first argue you didn't have to show prejudice? When did we first ever? Yeah. On direct appeal in the State court of appeals. I'm going to reserve the rest of the time. Thank you. Good morning. May it please the Court. Harry Colombo, W. Attorney General, preparing for Respondents, appellees in this case. This Court really only has one issue to decide, I submit, and that is simply whether or not the California Supreme Court's summary denial of habeas relief in that court was an unreasonable, excuse me, objectively unreasonable decision based upon the information presented to it. In other words, whether or not that decision was contrary to or an unreasonable application of controlling federal law. Appellants make it clear that the exact same evidence and information that they presented to the District Court in this case was also presented to the California Supreme Court, with one exception. That being the deposition testimony of defense counsel, which was taken pursuant to an order of the District Court to expand the record to include the reasons or lack thereof for counsel's conduct in the trial of this case in the Superior Court. And what the District Court determined was even after reviewing that deposition testimony, it found that counsel had failed to show that the tactical strategies and the decisions made at the trial court level were prejudicial. That is, in this case, the District Court essentially found that not only was it not prejudicial, it didn't even reach that question. It said counsel did not fall below an objective standard under prevailing professional norms. So the argument that's now been proffered to this Court by appellants counsel is essentially that the District Court erroneously evaluated under Strickland counsel's performance and determined that it not only was unprofessional, but that it was prejudicial, a standard that they have not met. They did not meet that in the Court of Appeal. They did not meet that before the California Supreme Court. They have not met that in the District Court. They're now asking this Court essentially to overturn and reverse three previous judicial determinations that there was no ineffective assistance in this case. And I submit that those previous courts' decisions were all correct, including that of the District Court. What this case boiled down to was essentially, as the District Court found, a question of who was going to be believed. Gunner Johnson, the surviving victim of the robbery, attempted murder, and murder of Mr. Klein, or Richter, the only other person who testified, who testified that he was supposedly not even in the house when the crimes occurred. This testimony of Richter's put Branscom's counsel in a precarious predicament, because, as the deposition testimony of Dixon, Mr. Dixon showed, he fully expected that his client was going to testify up until the moment he heard the testimony of Mr. Richter. And then realizing that his client's testimony would be directly contrary to that not testify. I think that's an eminently reasonable strategic choice. If defense counsel is put in a position where to put on his counsel is going to present a contrary record to that which has been made by his co-defendant, that clearly inures to the benefit of the prosecution, which is going to get up and argue, ladies and gentlemen, the defense can't even get their story straight. So under those circumstances, I submit that on this record, counsel clearly made the only appropriate choice he could make, which was to try to attack the credibility of Johnson, based upon the testimony that had been presented by Mr. Richter, and try to make the best of an extraordinarily bad situation. The 600, proverbial 600-pound gorilla that appellants counsel have never addressed in this particular case is how do we explain away the fact that there are two different caliber shell casings found at the crime scene, three of which are in close proximity to the decedent's body when the investigators show up. And another shell casing close by, which is consistent with the victim's testimony that he awoke in the middle of the night to find these two guys stealing his property, and upon realizing that these were people who had been in his house just a short time before, suddenly and spontaneously shot him, causing him to fall onto his bed, severely wounded. Fortunately, he didn't die. Now, appellants counsel seem to make great hay about, well, you know, who made this blood pool? Who made the blood spatters? Could they have attacked that forensic testimony? Sure, they probably could have. But the bottom line was the jury chose to believe the testimony of the victim, that he had been shot by these two individuals, not just one, and that this wasn't a spontaneous gunfight that erupted when the victim awoke to see somebody in his house he wasn't expecting to see. Well, if the 600-pound gorilla were the gun ballistics, were the ballistics stuff, it seems obvious that nobody did anything about that. Wouldn't that just add to what counsel is really talking about? We should have gone out and done something about trying to put the ballistics together. Well, they did. Well. They actually, in point of fact, did that. Defense counsel for Mr. Richter actually found the victim's .32 caliber MAC-12 pistol out somewhere in the YOLO bypass, turned it over to the prosecution, whose expert then examined it and said, lookit, this gun has been modified. It might, under certain circumstances, be prone to jamming or misfiring. I don't know. I fired it three times and never had a problem with it. And I'm supposed to say then defense counsel should just rely on that, given that that's all he needs to do then to defend his client? Well, actually, if we take at face value the affidavit or declaration of the now proposed defense ballistics expert, all he can say is, yes, in my opinion, this gun would be prone to jamming. So what do we have there? Now we've got a debate between experts about whether or not this modified firearm may or may not have jammed under what circumstances. We don't know. The bottom line question to that is, there's really still no evidence to suggest that that firearm had ever been fired on that particular morning at that particular time, which initiated this supposed gunfight, which is only established inferentially from the testimony of Mr. Richter saying, when I picked up Branscombe in the truck, he said, oh, they fired at me. They tried to kill me. He testified he wasn't even there. He doesn't know what actually happened. That's the problem for the defense. The defense chose to rely upon Richter's testimony that Branscombe said, they fired at me. He affirmatively denied he was even in the house. So the jury had to choose to believe either Richter was there and a co-participant in this crime based upon Johnson's testimony, or he wasn't there at all. Unless there are any further questions, we're prepared to submit the matter. Thank you. Thank you. I do have one question. If the blood pool came from Klein, what would that suggest? I'm sorry, what? If the blood pool came from Klein, what would that suggest? Carter and Hall. I suppose at best it could suggest that Klein was standing rather than on the couch at the time that he was shot with the mortal wound that he suffered. That leads to another entirely speculative problem, which is the testimony of the blood spatter expert, who was the detector from the Sheriff's Department, said, the way the blood pooled around the couch suggested that Klein was asleep when shot and killed and never moved. So if, in fact, Klein had been standing rather than lying down on the couch at the moment that he suffered the gunshot wound that killed him, I suppose that might have created some arguable evidence to support Branscom's statement, his spontaneous exclamation, they shot at me, they tried to kill me. Maybe he was standing, maybe he wasn't, who knows. I think that just adds another debatable point, but I don't think it changes the ultimate matrix the jury had before it in determining who did what. Unless there's anything else, thank you. Thank you. I will be brief again. I have to split time with counsel. I will start with what counsel talked about, the 600-pound gorilla in the case. I guess we go to different zoos. The 600-pound gorilla in this case is the blood pool. If that blood pool is from Patrick Klein, the State's theory is wrong. It couldn't be Patrick Klein standing up. That was never part of the State's theory. The State's theory is Patrick Klein is on the couch. If the blood pool is not his, and it isn't, the State's case falls. Counsel referred to the district court's factual finding, and I think, Judge Smith, you did also about counsel having made objections when he heard this. And I talked about my legal concern with that in terms of it being a credibility case. And I want to make sure the court doesn't resolve this case under a mistaken impression of the facts. Counsel did not make any objections. It's true at his deposition, he said, when they offered Bell, I objected, and I moved for a preliminary facts hearing. And when they offered Spriggs, I objected. But when you look at the actual transcript, you will see that no objections were made. And this is not uncommon. The deposition was many years later. Counsel has much more experience. They sometimes conflate what they wish they did with what they did. But the contemporaneous record shows that no motions at all were made and no request for continuance. And finally, counsel suggested that there was no evidence that the MAC-12 was fired that night. And that is just plain wrong. The testimony that came to the jury was that Branscombe said, they fired at me, they fired that gun. And he pointed at the MAC-12 and then picked it up.  And if, in fact, that bullet hole in the floor is from a .380 caliber, as our expert says, that means there was a gunfight in the house that night. Because, remember, Gunner's explanation for that was that it was a .22. And if Gunner lied about that, as our expert says he did, then there was a gun battle in the house that night, and, again, the State's theory false. Unless the Court has any other questions. And who gave that testimony again? Richter testifying about what Branscombe said. I was going to say, Branscombe didn't give any testimony. No, he didn't. Thank you, Your Honor. Thank you. Thank you, Your Honor. There are two serious problems I have with the Respondent's argument, Mr. Colombo's argument. One was just, I think he misspoke when he talked about the MAC-12 being a .32 caliber pistol. It's clear from the record it was a .380. And that goes back to what Mr. Garner was just talking about. If the hole in the ground was a .380, that's inconsistent with Gunner Johnson's testimony. The judge in district court in Habeas made some findings that the experts, the defense experts or investigators went out and confirmed or at least accepted the .22 caliber hole in the wall, in the floor rather. And if you look back at the opening statement and at some of the other comments, all that the defense attorney, and it's Mr. Axsoff, it's not Mr. Dixon, so it's not only Mr. Richter's testimony, attorney. He says we went out there, we found other shell casings. There's actually stipulation in the record. I believe it's after Jill Sprigg's testimony, but I can't, I'm not positive of that, that there were other shell casings, .22s, found in various places, some unknown by other people who live in the house. So there's shell casings all over the place. The problem with this is that there was a failure of the defense attorneys to go out and independently find out what was going on. They knew about the hole in the floor. They certainly knew about it pretrial, it looks like, or on the eve of trial, and they did nothing with it. And my only final point is a lot of Mr. Colombo's arguments, and I respect Mr. Colombo a lot, but the problem with this case is he's conflating what the district court judge's findings about reasonable performance with two different attorneys. The district court found no reasonable performance by Mr. Dixon on behalf of Mr. Branscom. And I think that when you analyze this, for both of our clients, for both appellants, you have to, cannot look at what, how reasonable Mr. Axsop was in comparison to Mr. Dixon. Mr. Dixon did nothing. And the fact that Axsop formulated a plan but then failed to execute it doesn't save either his performance or show that there was no prejudice. And I think that the case is won. Thank you, counsel. Thank you very much. All right. Then case numbers 0615614 and 0615776, Richter v. Hickman, are now submitted. Thank you very much, counsel. This court is adjourned. Anything further? This court is adjourned.
judges: Beezer, Trott, Smith En Banc Panel:, Kozinski, Reinhardt, O'scannlain, Kleinfeld, Silverman, Wardlaw, Fisher, Paez, Bybee, Smith, Ikuta